2013 JUN -3 AM 10: 03



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| GOVERNORS POINT DEVELOPMENT COMPANY, | ) ) ) | No. 68079-0-I |
| Appellant/Cross Respondent, | ) ) | |
| v. | ) ) ) | |
| CITY OF BELLINGHAM, a Washington municipal corporation, and THOMAS L. ROSENBERG, its Director of Public Works, | ) ) ) ) ) | |
| Respondents/Cross Appellant, | ) ) | |
| and | ) ) | |
| FRIENDS OF CHUCKANUT, a Washington nonprofit corporation, | ) ) ) | UNPUBLISHED OPINION |
| Respondent/Cross Appellant. | ) ) ) | FILED: June 3, 2013 |

VERELLEN, J. — In 2009, Governors Point Development Company (GPDC) requested the City of Bellingham (City) to supply water to it as a water association, so it could provide water to each of its 141 proposed lots on Governors Point, a peninsula just south of Bellingham near Chuckanut Drive. The City refused because GPDC's land was outside of its urban growth area. GPDC sued the City for breach of an implied contract to provide water and for a declaratory judgment that the City had violated

RCW 43.20.260. The trial court granted the City's motions for summary judgment and dismissed GPDC's case.

A municipality may have an implied contract to provide water: (1) if the municipality holds itself out as a public utility willing to serve all users; or (2) if, through a course of dealing and common understanding, the parties show a mutual intent to contract with each other. The City unequivocally refused to provide water to GPDC at numerous points during the parties' course of dealing, and the City both granted and rejected requests for water from other users. Even if such an implied contract existed, the statute of limitations on GPDC's implied contract cause of action began to run in the early 1990s, when the City unequivocally refused to provide water to GPDC's proposed development.

We affirm the trial court's grant of summary judgment on the implied contract claim. We also affirm dismissal of GPDC's claim based on RCW 43.20.260, which applies to retail water service contracts and not to bulk water purchasers like GPDC.

## FACTS

The parties recount a lengthy history. Governors Point is a forested peninsula located approximately five miles south of the city of Bellingham. Of the 157 acres that constitute the peninsula, GPDC owns 125. The land not owned by GPDC is currently divided into five parcels. The Dahlgren and Hunt parcels are served by City water. The McCush parcel is served by the GPDC water system.[1] The owners of the Gibb parcel

---

[1] Until 1988, when the Dahlgren residence on the south end of Governors Point obtained a direct connection to a City water main, the Dahlgren parcel was served by GPDC. From 1988 on, the McCush parcel has been the only property served by the GPDC water system.

applied for City water in 2005, but the City denied their application.[2] The fifth parcel is a conservation area called the Chuckanut Beaches Association.

The Governors Point property was originally owned by the Larrabee Real Estate Company and was included in the City's water book in the 1940s. The City used the water book as a reference for the city engineer and the public because it identified where the City had extended water and where it intended to provide water.

GPDC was incorporated in 1953 by Eino Usitalo and Lee Simonson, who had purchased the Governors Point property from Larrabee Real Estate Company in 1949. GPDC is now owned by Roger Sahlin.[3] Mr. Sahlin's father, Carl Sahlin, purchased the land from GPDC in increments in a series of transactions between 1960 and 1969. In 1964, Carl Sahlin purchased GPDC itself, obtaining the remaining acreage that he had not already bought from the company.

In 1953, before GPDC was under the ownership of the Sahlin family, Mr. Usitalo requested the City to extend water to Governors Point, and the City thereafter installed a four-inch tap and meter to serve GPDC. The City system served parcels on the nearby Pleasant Bay Road as well as the McCush parcel. Thereafter, GPDC constructed water mains running to the north and sound ends of its own property. According to Mr. Roger Sahlin, GPDC began regularly paying the City for water in 1954. Bills from 1967 and 1977 show that the City billed GPDC for the water, and GPDC

---

[2] The Gibb property was created from a short plat of the Dahlgren parcel, and was not within the City's water service zone at the time of the request for water service. The Gibb property is served by a well.

[3] The 125 acres of land are jointly owned by GPDC, as well as by three limited liability companies owned by Mr. Sahlin, his wife and his children. Some of the land is also in trust.

3

forwarded the bill to the two homeowners on Governors Point (in that timeframe, the Dahlgren and McCush residences).[4]

In 1971, GPDC received preliminary plat approval from Whatcom County (County) for a 308-lot subdivision of the Governors Point property, known as Pointe Chuckanut. The County required GPDC to obtain approval from the City to provide the property with City water. In May 1972, GPDC submitted a formal request to the water board[5] that the City provide water to its Pointe Chuckanut development. The proposal included the establishment of a water association that would purchase water from the City through "master metering control" and would maintain "all internal systems."[6] The proposal included an internal reservoir storage that would be constructed on GPDC property.

The September 1972 record of proceedings of the board of water commissioners reveals the water board's decision that the "Water Superintendent proceed with plans to serve Pointe Chuckanut [GPDC] development on Pleasant Bay Road with the cost to be either $650 per unit including fire protection or $525 per unit for domestic service only."[7] After the water board's decision in September 1972, GPDC built roads and staked the

---

[4] In 1964, the Flint family bought a parcel from GPDC and sought water service from the City. In response, the City referred the Flints to GPDC, stating "the Governor's Point area is supplied with city water through a water district." Clerk's Papers at 967. The Flints never built a home, and Carl Sahlin bought back the Flint parcel.

[5] Until 1973, the water board had authority over the City's water system, and that authority included "managing and controlling of waters, water rights and water works that are now, or may be hereafter owned by the City of Bellingham." Clerk's Papers at 960.

[6] Clerk's Papers at 818.

[7] Clerk's Papers at 831.

4

lots in preparation for the final recording of the first phase of the plat. GPDC did not obtain the final plat approval and recording as Mr. Carl Sahlin, the original owner of GPDC, fell ill in 1973 and died in 1974.

In 1976, the City declared a moratorium on the extension of City water beyond "municipal boundaries."[8] In 1979, the City passed Ordinance 8728 defining areas outside the municipal boundaries in which the City would provide water (and other) services. Ordinance 8728 lifted the 1976 moratorium and set forth a framework whereby the City would "designate such areas as Service Zones within which further extensions and Direct Service will continue to be authorized, subject to applicable law."[9] The water service zone designated by Ordinance 8728 did not include GPDC's property.

In 1978, prior to the passage of Ordinance 8728, GPDC had written to the City to protest the exclusion of Governors Point from the proposed water service zones. GPDC highlighted the existence of the City's four-inch main that already served parcels on Governors Point, including the McCush and Dahlgren parcels. GPDC requested the City to "commit itself to continue to serve as a designated service area those geographic locations to which it is already providing service."[10] In January 1979, John Garner, the director of public works for the City, replied:

> The intent of that Direct Service Zone is to describe properties served directly by the City . . . . For purposes of this ordinance, direct service means the condition where a City-owned main fronts on the parcel receiving service and that service is directly between the City and the receiver, not through an intermediary organization such as an association, district or co-op. My understanding of the Governor's Point situation is

[8] Clerk's Papers at 1181.

[9] Clerk's Papers at 1184.

[10] Clerk's Papers at 974.

5

that service is through an intermediary organization and any indication otherwise would be helpful in reviewing the situation.[11]

Consistent with Garner's earlier communication with GPDC, Ordinance 8728 contemplated the City would continue to provide water outside its service zone to water districts and associations:

> Existing contracts with districts and associations for water distribution and sewerage collection services may be renewed or extended and contracts negotiated with newly formed districts or associations, but all such contracts shall be subject to the terms and conditions of this ordinance.[12]

In June 1985, the City adopted Ordinance 9461, codified at Bellingam Municipal Code (BMC) 15.36.065. The ordinance implemented RCW 35.13.177, which allowed cities to prepare comprehensive land use plans. Ordinance 9461 identified and established an "Urban Service Area" surrounding Bellingham city limits which "might reasonably be expected to be developed at urban levels in the foreseeable future."[13] The ordinance excluded the entirety of the Governors Point peninsula from the urban service area. Ordinance 9461 also stated that the City would not "consider extending water and/or sewer service zones into areas which are not within the City's Urban Service Area."[14]

In 1989, the City replaced the original water main along Chuckanut Drive with a 12-inch water main that ran from the southern city limits to Cove Road.[15] According to

---

[11] Clerk's Papers at 976.

[12] Clerk's Papers at 1188.

[13] Clerk's Papers at 1218.

[14] Clerk's Papers at 1219.

[15] Cove Road extends southwest from Chuckanut Drive and intersects with Pleasant Bay Road just south of the Governors Point peninsula. The Chuckanut main

Ronald Jepson, the civil engineer who has worked for GPDC since 1971, Garner (public works director for the City) told Mr. Jepson shortly after the replacement of the water main that "Well, now you have plenty of water for your development out there."[16]

In 1990, GPDC applied to the County for a short plat subdivision to develop 57 acres of its property. The County forwarded the application to the City, as the application had indicated water would be provided by the City. In the space provided for comments, Garner, on behalf of the City, replied, "Water is NOT available to new lots in this area from the City of Bellingham. The property is outside our Water Service Zone and outside the Urban Service Area jointly set by the City and County."[17]

In 1992, GPDC submitted to the County a 141-lot subdivision application. The City provided its formal comments to the County on the proposed subdivision. The City's technical review committee considered the proposal and determined the site was not in the City's current water service area. The City's comment stated, "[I]t is the City's policy not to extend utilities outside this area," and recommended that "the project not proceed at this time."[18] The City recognized that City water already ran adjacent to the proposed development. The City further explained that the County and City were implementing the comprehensive planning process mandated by the Growth Management Act, chapter

_____

referenced here is different from the four-inch main adjacent to Governors Point. See Clerk's Papers at 931.

[16] Clerk's Papers at 802.

[17] Clerk's Papers at 1167.

[18] Clerk's Papers at 1077.

36.70A RCW, and the City's preliminary analysis did "not support a need for urban levels of growth at this distance from the existing southern boundary of the City."[19]

After the County denied GPDC's application for its 141-lot subdivision, GPDC took another tack. Later in 1992, it requested via letter that the City enlarge its sewer and water service zones to include Governors Point, and that the City enlarge the urban service area to include Governors Point. The City denied GPDC's request. The denial letter stated:

> [T]his property is outside the urban service area established by BMC 15.36.065 [Ordinance 9461]. The City's code (BMC 15.36.080) states that water and sewer service requests outside the urban service area will not be considered. . . .
>
> You have further requested that the urban service area be expanded to include Governor's Point. The City's code (BMC 15.36.065) provides that such expansions be done in the manner of a Comprehensive Plan Amendment.[20]

The letter recommended that GPDC pursue the matter with the City's planning department if GPDC wished to petition for such an expansion.

In 1993, the City adopted a comprehensive water plan.[21] The comprehensive water plan delineated a water service area, which did not include Governors Point. The comprehensive water plan also delineated a future water service area, which did include Governors Point. The plan stated, "While technically within the Ultimate Service Area,

---

[19] Clerk's Papers at 1077.

[20] Clerk's Papers at 1241.

[21] Under the Growth Management Act, the County had to adopt urban growth areas by October 1, 1993. RCW 36.70A.110(5).

8

the parcels with rural or agricultural zoning are not expected to be served in the near future."[22]

In 2005, the City updated the water system plan to come into compliance with the State Department of Health's requirement that water system plans be updated every six years. The City's 2005 water system plan service area boundaries map shows the water service area terminating at the city's southern border, north of Governors Point.

On March 6, 2006, the City passed Ordinance 2006-03-026 (also known as the utilities service extension ordinance) to bring itself into compliance with certain provisions of the Growth Management Act. The City's findings supporting Ordinance 2006-03-026 state, "Ordinance No. 8728 is inconsistent with the GMA to the extent it authorizes the extension of City water and sewer service into areas outside the City's Urban Growth Area."[23] Ordinance 2006-03-026 explicitly repealed Ordinance 8728, and with it the water service zones that had been in place in the prior decades.

Ordinance 2006-03-026 also addressed the language in Ordinance 8728 that allowed the City to enter into contracts with water associations for provision of water outside the water service zones. Ordinance 2006-03-026 stated:

> The City is under no legal obligation to extend water and/or sewer service outside its corporate limits, absent a contractual duty. City Council finds that Ordinance No. 8728 was not intended to create any such contractual duty, express or implied. Rather, it was intended merely to create an opportunity to apply for an extension, which the City, in its discretion, could grant or deny based upon listed criteria.[24]

---

[22] Clerk's Papers at 1148-49.

[23] Clerk's Papers at 1123.

[24] Clerk's Papers at 1123.

Ordinance 2006-03-026 also provided that "[t]he City will not extend or expand urban governmental services such as water and sewer outside the Urban Growth Area unless authorized by law."[25] Although the ordinance did not terminate any existing water service that was outside the urban growth area, it provided, "City Council does not intend for the continuation of these existing services to be modified, expanded or extended."[26] Finally, Section 1.E stated that Ordinance 2006-03-026 would not "terminate any water or sewer service that is in existence as of this Ordinance's effective date."[27]

On June 19, 2006, shortly after the effective date of Ordinance 2006-03-026, the city council passed Ordinance 2006-06-064, which amended section 1.E of Ordinance 2006-03-026—the section that addressed the continuation of water service "in existence" as of the effective date.[28] According to Brent Baldwin, development manager

---

[25] Clerk's Papers at 1124.

[26] Clerk's Papers at 1124.

[27] Clerk's Papers at 1124. "In existence" was defined to mean "the property is currently receiving service and/or shall have a fully signed, valid, and recorded utility service zone agreement." Clerk's Papers at 1124.

[28] The full text provided:

Ordinance 2006-03-026 Section 1.E. is hereby amended as follows:

E. City Council does not intend to terminate any water or sewer service that is in existence within a zone created by ordinance 8728 as of this Ordinance's effective date.

i. For purposes of this Ordinance, "in existence" means one or more of the following: (1) the property is currently receiving service; (2) the property owner shall have a fully signed, valid, and recorded utility service zone agreement on or before March 21, 2006; (3) the property owner has written documentation dated on or before March 21, 2006 demonstrating the City's intent to serve the property; or (4) the property proposed to be served is in a water service zone created by Ordinance 8728 in the area

10

for the City's public works department, GPDC failed to meet the "in existence"

requirements of Ordinance 2006-06-064.

At a city council committee meeting on June 5, 2006, days before the City

passed Ordinance 2006-06-064, Dick McKinley, Garner's successor as public works

director, mentioned Governors Point:

> BARBARA RYAN: Thank you, the next item is an ordinance amending another ordinance regarding water and sewer service extension zones.
>
> . . . .
>
> MR. MCKINLEY: If they try to say that one of the neighboring properties [referencing the "in existence" definition of Ordinance 2006-06-064] is two and a half miles away we'll probably not go with the (inaudible).
>
> MS. BJORNSON: Unless there's a one big one then it will come up so--
>
> MR. MCKINLEY: But we're not talking about Governor's Point here.
>
> MS. BJORNSON: Yeah, well--

---

commonly referred to as "Chuckanut" and the property proposed to be served abuts a water main and at least two neighboring properties were receiving water service on or before March 21, 2006.

ii. Those properties that meet the foregoing definition of "in existence" but do not have an executed utility service zone agreement shall enter into such a contract and pay any applicable fees on or before one year after this Ordinance's effective date. If a utility service zone agreement is not fully executed by the foregoing date, the property will no longer be considered "in existence" for purposes of this Ordinance and service will not be provided. For those properties proposed to be served under this Ordinance that are outside the City's Urban Growth Area in the "Chuckanut" area, each property shall only receive one water service connection unless: there was a short plat application for the property pending on March 21, 2006; or there was a utility service zone agreement in existence on March 21, 2006 which specifically provides otherwise; or the property owner's written documentation shows the City's intent to serve more than one water service connection.

Clerk's Papers at 1127.

11

MR. MCKINLEY:     We're not talking about Governor's Point.

MS. BJORNSON:     Well, that's what I want to make sure.

MR. MCKINLEY:     That's not part of this, that never was part of this, that's not going to be part of this, we're not talking about Governor's Point.[29]

According to GPDC, McKinley's statements meant that Ordinance 2006-06-064 did not apply to Governors Point.

Despite the existence of the above ordinances requiring new water service to be within the urban growth area, according to Jepson, "between 2004 and 2007 the City entered into at least 53 contracts to supply at least 78 new water services in the Chuckanut area,[30] none of which were within the City's urban growth area.

On June 14, 2007, GPDC's counsel sent a letter to Mr. McKinley proposing three alternatives for water service: (1) service via extension of City service directly to individual lots on Governors Point; (2) service via GPDC acting as a bulk water purchaser and purveyor—including construction of a storage facility to serve GPDC lots and other City water customers nearby and upgrades to City pipes leading to Governors Point; or (3) service via the existing four-inch main already in place, with construction of a storage facility that would serve only Governors Point.

In the same letter, GPDC also addressed the applicability of Ordinances Nos. 2006-03-026 and 2006-06-064:

You have indicated publicly that recently passed Bellingham City Ordinances Nos. 2006-03-026 and 2006-06-064 do not apply to Governors Point. We agree with you and believe, as outlined above, that the issue of service was dealt with years ago. Final engineering decisions

---

[29] Clerk's Papers at 333, 342-43.

[30] Clerk's Papers at 801.

need to be made and implemented. However, *in the event* that the City determines that the ordinances do apply to Governors Point and to avoid any future confusion with regard to that determination, we are submitting this basic data for the formation of a contract for a utility service agreement and requesting that you accept this submission and the attached detailed narrative as a request for a "contract" pursuant to Ordinances Nos. 2006-03-026 and 2006-06-064. Assuming those ordinances do not apply then we simply suggest we meet to discuss engineering implementation and related concerns.[31]

In 2008, the City and County corresponded numerous times to determine each other's positions on the availability of City water for the GPDC development. On February 14, 2008, an assistant city attorney wrote to David Stalheim, the director of the Whatcom County Planning & Development Services, to inform the County that "[a]t this time, the City is unaware of any legal obligation to provide water service to this subdivision, and has no plans to provide such water."[32] On May 23, 2008, the mayor wrote Stalheim informing the County that

> the City will not provide City water to the proposed 141-unit subdivision at Governors Point. This has been the City's position since at least June 1990 . . . . Statements by the developers of the proposed subdivision that the City has a legal obligation to provide water for the project have not changed the City's position.[33]

The City then learned of GPDC's plans to construct a reverse-osmosis plant to provide water for the development.[34]

On February 9, 2009, an assistant city attorney wrote to the County after receiving a letter from GPDC representatives asking that Governors Point be included in

---

[31] Clerk's Papers at 981-82.

[32] Clerk's Papers at 1062.

[33] Clerk's Papers at 1064.

[34] GPDC filed an application with the County for construction of a reverse-osmosis desalination facility.

the boundaries of a LAMIRD (limited areas of more intense rural development). The city attorney stated:

> *The City is on record dating back to at least May 1990 that it will not provide water service for the proposed 141-unit Governors Point subdivision.* The City is unaware of any legal obligation to supply water to the proposed subdivision which is located 5 miles outside the City and its urban growth area and believes providing such water would violate local and state law.[35]

On February 11, 2009, GPDC submitted a formal request to the public works director that the City formalize a contract for water services with GPDC.[36] GPDC entitled the document "Governors Pointe Development: Request for Formal Water Resale Contract," and stated it sought "a formalized contract with the City to allow GPDC to continue in its function as a water association to purchase water from the City and resell that water to the entire planned development at Governors Pointe."[37]

On March 6, 2009, via letter, the public works director denied GPDC's request, based on the purported lack of contractual relationship with GPDC, its formerly adopted policy against extending or expanding water service outside the urban growth area as documented in Ordinance 2006-03-026, and the GMA prohibition on the City extending water into rural areas. The letter concluded stating, "I am not authorized to process your request for a formal water resale contract to serve the proposed Governors Point subdivision."[38] GPDC appealed the public works director's decision to the city council.

---

[35] Clerk's Papers at 1069.

[36] The letter is written on behalf of Triple R Residential Construction Company. According to information provided by the Secretary of State corporations database, the governing persons of the company are members of the Sahlin family.

[37] Clerk's Papers at 716, 726.

[38] Clerk's Papers at 1105.

On June 15, 2009, the city council held a public hearing to consider the matter. On June 29, the city council voted to affirm the public works director's denial of GPDC's request for a resale water contract.

In September 2008, the City had prepared a draft revised water system plan delineating an "Existing Retail Service Area" that included Governors Point.[39] This draft revised water system plan was the document GPDC asserts it relied on when it submitted its February 2009 formal request for contract services. The draft plan was never adopted by the City.

In August 2009, the City adopted its new water system plan to bring it into compliance with the State Department of Health. The map of the 2009 water system plan delineated the same urban growth area as the prior water system plan, as well as a "Retail Service Area."[40] Governors Point was excluded from both the urban growth area and the retail service area.

## PROCEDURAL HISTORY

In August 2009, after the City's denial of water service, GPDC sued the City for (1) breach of an implied contract arising from the parties' historical interactions; and (2) a declaratory judgment that the City had violated RCW 43.20.260, which sets forth the circumstances under which a municipal water supplier has a duty to provide retail water service, and that the City had failed to conduct a feasibility study of GPDC's

---

[39] Clerk's Papers at 903. On July 24, 2008, the State Department of Health notified the City that its water system plan had not been updated as required under state law.

[40] Clerk's Papers at 1153.

proposed water plan under BMC 15.36.090 (2008); and (3) a writ of mandamus ordering the City to conduct a feasibility study.

The City filed two motions for partial summary judgment. In the first motion, the City argued it was entitled to judgment as a matter of law on GPDC's implied contract causes of action. In the second motion, the City argued it was entitled to summary dismissal of both GPDC's causes of action under RCW 43.20.260, and to the writ of mandamus to conduct the feasibility study. The trial court granted both motions and dismissed GPDC's case because none of GPDC's claims remained. GPDC appeals, contending the trial court disregarded material facts that precluded summary judgment on both the contract and statutory violation claims.

## ANALYSIS

We review summary judgment determinations de novo, engaging in the same inquiry as the trial court.[41] "'Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.'"[42] The facts and all reasonable inferences therefrom are considered in the light most favorable to the nonmoving party.[43] Summary judgment is appropriate if reasonable minds could reach but one conclusion from all the evidence.[44] Bare assertions that a

---

[41] Harberd v. City of Kettle Falls, 120 Wn. App. 498, 507, 84 P.3d 1241 (2004).

[42] Id. (quoting Trimble v. Wash. State Univ., 140 Wn.2d 88, 92, 993 P.2d 259 (2000)).

[43] Id.

[44] Id. at 507-08.

genuine issue of material fact exists will not defeat summary judgment in the absence of actual evidence.[45]

FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT
IMPLIED CONTRACT

The City moved for partial summary judgment on (1) whether the City held itself out as a public utility willing to serve all customers in the Chuckanut area; (2) whether the City and GPDC had a course of dealing and common understanding showing a mutual intent to contract for the City's provision of water to GPDC; and (3) whether the statute of limitations barred GPDC's contract claims. The trial court granted the motion.

GPDC argues the trial court erred in determining that an implied contract between GPDC and the City for water service to Governors Point did not exist as a matter of law. Washington courts recognize two scenarios in which a municipality has a duty to provide water service outsides its corporate limits.[46] The first scenario is "where a municipality holds itself out as a public utility willing to supply all those who request service in a general area."[47] The second scenario is where the parties show a mutual intent to contract with each other. "'An implied contract comes about when through a

---

[45] Id. at 508.

[46] A municipality may also have a duty to provide water service if it "is the exclusive supplier of sewer or water service in a region extending beyond the borders of the city." Yakima County Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 382, 858 P.2d 245 (1993). The duty is not absolute, because the city may deny service if provision of service would compromise capacity. Id. GPDC does not argue the City owed a duty under this standard.

[47] Brookens v. City of Yakima, 15 Wn. App. 464, 466-67, 550 P.2d 30 (1976); see also Harberd, 120 Wn. App. at 516.

course of dealing and common understanding, the parties show a mutual intent to contract with each other.'"[48]

### a. Municipality as a Public Utility

The public utility theory recognizes that "'[a] contract to supply water may . . . be found by implication, as where a municipality holds itself out as a public utility willing to supply all those who request service in a general area.'"[49] GPDC argues there are genuine issues of material fact concerning whether the City held itself out as a public utility willing to serve all landowners in the Chuckanut area.

GPDC contends the City has historically provided water service to those around Chuckanut Drive and Pleasant Bay Road, as well as on the McCush property, which is on the Governors Point peninsula itself. GPDC contends the City was willing to serve the area as whole, in part because the City replaced the original six-inch main along Chuckanut Drive near Governors Point with a 12-inch main, and the public works director told GPDC there would be plenty of water for GPDC's development.[50] GPDC also highlights the City's inclusion of Governors Point in the 2008 draft water plan.[51] Finally, GPDC contends that the City's decision to supply at least 78 new water services

---

[48] Harberd, 120 Wn. App. at 516 (alteration omitted) (quoting Irvin Water Dist. No. 6 v. Jackson P'ship, 109 Wn. App. 113, 122, 34 P.3d 840 (2001)).

[49] Id. (quoting Brookens, 15 Wn. App. at 466).

[50] The Chuckanut main referenced here is different from the four-inch main adjacent to Governors Point.

[51] GPDC also contends the City included Governors Point in a potential water service area plan in 2005, but the map itself appears to put Governors Point outside the "Potential Serviceable Boundary." Clerk's Papers at 875.

18

"within the Chuckanut area" demonstrates the City's willingness to supply water to all users.[52]

Two Court of Appeals decisions have applied the public utility theory of implied contract. In Harberd v. City of Kettle Falls, a landowner sued the City of Kettle Falls alleging the City had breached an agreement to provide water to Harberd's property.[53] Harberd initially reached an agreement for the provision of City water to his property, which was outside of town.[54] The City agreed to provide two water hookups to Tract I (five acres) of the total 103 acres.[55] Shortly thereafter, the City agreed to provide six more hookups, one for Tract I and five for new tracts.[56] Harberd then told the City he intended to develop another 50 acres with 30 proposed hookups.[57] The City referred Harberd to the city council.[58]

After the city council had granted Harberd more hookups, the Department of Health informed the City it had to limit the number of new hookups.[59] As the City considered how to implement the limit imposed by the operating permit issued to the

---

[52] Appellant's Reply Br. at 3-4. The parties do not define what precise geographical area is in dispute, i.e., in which area beyond the municipal boundaries did the City purportedly offer to supply water to all property indiscriminately. GPDC highlights the 1972 approval of service for the platting at Governors Point either via direct service if the area was upgraded, or by provision of City water to GPDC and further distribution through GPDC's role as a water association. We find this argument unpersuasive, as Governors Point is only part of the Chuckanut area.

[53] 120 Wn. App. 498, 501-02, 84 P.3d 1241 (2004).

[54] Id. at 501-03.

[55] Id. at 502.

[56] Id. at 503.

[57] Id.

[58] Id.

[59] Id. at 504.

City by the Department of Health, it began to deny applications for additional hookups, including Harberd's subsequent applications.[60] The City imposed a moratorium on new hookups to give itself time to update the water system.[61] When the City implemented its growth management plan in 1997, the City instituted a policy under which new hookups outside the urban growth area would be subject to various criteria.[62] The City then denied service to applicants outside the urban growth area.[63] When the City moved for summary judgment on whether it had taken on the role of public utility so far as to obligate it to an implied contract with Harberd, the trial court granted the City's motion.[64]

The appellate court affirmed, reasoning the City had "retained discretion to grant or deny water hookups" although the City granted far more than it denied.[65] The court also relied on the fact that the City's comprehensive plan foreclosed new out-of-town water hookups.[66]

In Brookens v. City of Yakima, the Brookenses received water from the City of Yakima to supply their home and a rental property, but then extended the water main without the City's knowledge to serve the remainder of their 11-acre tract of property.[67] The City's water main ran in front of their home.[68] When the Brookenses asked the City

---

[60] Id. at 505.

[61] Id.

[62] Id. at 506.

[63] Id. at 506-07.

[64] Id. at 507.

[65] Id. at 517.

[66] Id. at 519.

[67] 15 Wn. App. 464, 465, 550 P.2d 30 (1976).

[68] Id.

to continue supplying water to their property so they could build a 95-unit mobile home park, the City refused, and the Brookenses sued.[69]

Division Three of this court affirmed the trial court's dismissal of the Brookenses' complaint, holding that "[t]he power to supply water beyond corporate limits is permissive, with supply being a matter of contract between the municipality and the property owners."[70] With respect to the Brookenses' theory of implied contract based on a municipality acting as a public utility, the court reasoned, "We do not find the presence or absence of a water main in front of a home, which main supplies other homes in the area, necessarily to be holding out of such an intent."[71] Rather, the court reasoned the City's resolution to supply water only when the user complied with its general plan manifested the City's intent "not to supply the general area indiscriminately, nor expand any prior agreement with the Brookens."[72]

The City rightly contends that Brookens and Harberd control the outcome on GPDC's "public utility" theory of implied contract. First, as in Brookens, the fact the City had supplied water to the Dahlgren and Hunt parcels on Governors Point did not create an inference the City would serve all future development on the peninsula. Second, as in Harberd, the City retained discretion to grant and deny hookups in the Chuckanut area. Between 2006 and 2009, the City denied approximately 13 requests for new water service in the Chuckanut area, including for residences on Chuckanut Drive,

---

[69] Id.

[70] Id. at 465-66.

[71] Id. at 467.

[72] Id.

21

along Cove Road, and on Pleasant Bay road. The City also denied water to the Gibb parcel in 2005.

Finally, as in Brookens, the City's various ordinances requiring applicants to comply with the City's growth management plans did not imply the City held itself out as ready to serve all applicants. Rather, the ordinances are evidence the City did not intend to supply the Chuckanut area indiscriminately. For instance, Ordinance 8728 stated the City would continue to provide service outside the service zones, but also stated the City would retain discretion to determine whether new service contracts met the terms and conditions of the ordinance. Ordinance 8728 also conditioned the provision of water based on feasibility, requiring applicants to satisfy specific criteria to obtain service. Ordinance 9461 stated the City would not extend water service zones outside the urban service area, again communicating that the City retained discretion over whether it would provide water outside certain prescribed areas. The comprehensive water plans the City adopted in 1993, 2005, and 2009 did not include Governors Point (although, as the City concedes, the draft 2008 plan mistakenly did). And finally, Ordinance 2006-03-026 explicitly invalidated Ordinance 8728 to the extent it authorized the City to provide water outside the urban growth area (and specifically repealed the water service zone established by Ordinance 8278 that extended south of the city along Chuckanut Drive). Ordinance 2006-03-026 also stated that existing services could would not be extended or modified.[73]

---

[73] With respect to Ordinance 2006-06-064, GPDC contends the City held itself out as willing to serve all, but the GPDC does not relate its argument to any specific language in the ordinance. See Appellant's Br. at 37. The City responds this ordinance clarified which water service would continue, despite location outside the urban growth

Under Brookens and Harberd, the City did not hold itself out as a public utility willing to serve all who requested City water.[74]

b. Course of Dealing and Common Understanding

Alternatively, GPDC contends the following communications and actions created a genuine issue of material fact about whether the parties' course of dealing created an implied contract: (1) the inclusion of Governors Point in the City's water book in the 1940s and 1950s; (2) the City's 1953 approval of a four-inch tap and meter to the Governors Point property so GPDC could serve as a water district; (3) the fact that the City billed GPDC for water used on its property; and (4) the water board's statement in 1972 that it would supply City water to the property, enabling development.[75] The City acknowledges the parties reached an agreement in 1972, but points out that GPDC abandoned the 308-lot Point Chuckanut subdivision in the few years that followed the 1972 agreement.

GPDC also highlights the following evidence in further support of the parties' course of dealing and common understanding about the City's provision of water to Governors Point: (1) Roger Sahlin's testimony that his father, Carl, purchased the

area, rather than communicating a willingness to supply water to new users. See Resp't's Br. at 27. We agree with the City's view.

[74] GPDC also relies on Irvin Water Dist. v. Jackson P'ship, 109 Wn. App. 113, 122-23, 34 P.3d 840 (2001). That case addressed whether a water district had an implied contract to provide water at a specific cost. Id. The court held that the parties' implied contract to supply water did not encompass the price of the water. Id.

[75] GPDC devotes a portion of its brief to arguing the same evidence created an express contract. See Appellant's Br. at 36-37. GPDC did not argue the express contract theory in its complaint. See Clerk's Papers at 1278-81. Even if it had, the 1972 water board decision was the only express agreement in the record, and was subject to specific terms and conditions that were not satisfied when GPDC abandoned the 308-lot subdivision.

property because the City had already extended water to the property; (2) Carl Sahlin, in 1961, paid to extend the existing water main to the north end of Governors Point; (3) the McCush property on Governors Point has been served by the City's water main via GPDC's system since 1961; and (4) the City worked with GPDC to maintain the water main serving Governors Point.

The significant adversarial developments in the parties' interactions after 1972 undermine GPDC's theory of implied contract based on course of dealing. The City's conduct since 1972 demonstrates a lack of mutual intent to provide water to any future developments. Governors Point was not included in the water service zone upon adoption of Ordinance 8728 in 1979, nor was it included in the urban service area created in 1985 by Ordinance 9461.

In 1990, when GPDC submitted its short plat application to the County, the City told the County, "Water is NOT available to new lots in this area from the City of Bellingham. The property is outside our Water Service Zone and outside the Urban Service Area jointly set by the City and County."[76] The County communicated the City's denial directly to GPDC, stating in a letter, "[Y]our request for water service was denied by the City of Bellingham."[77] With regard to the 141-lot subdivision, initially proposed in 1992, the City wrote to the County and recommended the project not proceed. The City then denied GPDC's request later in 1992 to enlarge water service zones to include Governors Point (after the initial denial of the 141-lot subdivision).

---

[76] Clerk's Papers at 1167, 1234.

[77] Clerk's Papers at 1236.

Finally, in 2006, the City passed Ordinance 2006-03-026, stating, "The City will not extend or expand urban governmental services such as water and sewer outside the [urban growth area] unless authorized by law."[78] As the City highlights, the passing of the 2006 ordinance was a clear communication the City did not intend to extend service on Governors Point. Lastly, communications from the City to GPDC in 2008 stated the City would not provide water to Governors Point, and the City asserted it had taken this position since at least 1990.

After the 1972 decision by the water board, GPDC received a handful of communications from City officials which, GPDC argues, create a genuine issue of material fact regarding the parties' common understanding and mutual intent. In 1979, the City assured GPDC that it would not be affected by Ordinance 8728's exclusion of Governors Point from the service areas because that ordinance applied to "direct service" rather than to intermediary organizations.[79] In 1989, when the City replaced the water main along Chuckanut Drive with a 12-inch pipe, the public works director (then John Garner) told Jepson, "Well, now you have plenty of water for your development out there."[80] And, in 2006, the public works director (then Dick McKinley) stated in a city council meeting that Ordinance 2006-06-064, which defined what it meant to have service "in existence" at the time of the passing of Ordinance 2006-03-026 (which prevented the City from providing service outside the City's urban growth area), did not apply to Governors Point.

---

[78] Clerk's Papers at 1124.

[79] Clerk's Papers at 976.

[80] Clerk's Papers at 802.

These communications do not create a genuine issue of material fact as to the course of dealing. While the parties agreed in 1972 that the City would provide water for the subsequently abandoned 308-lot development, the comprehensive course of dealing over the following 37 years reveals the parties never reached a common understanding regarding how or whether the City would provide water to GPDC. Even viewed in a light most favorable to GPDC, the post-1972 communications on which GPDC relies are de minimis. The 1979 statement that Ordinance 8728 does not extend to intermediary suppliers does not confirm a mutual intent for vastly expanded delivery of City water to GPDC as an intermediary. The 1989 statement by Garner was an isolated offhand comment made when Garner happened to run into Jepson. The dialogue at the 2006 city council meeting that "we're not talking about Governors Point" is ambiguous and does not reflect a mutual recognition of a right to City water.[81] After 1972, GPDC may have assumed that the City would provide water, but every time GPDC attempted to secure water for development of its property, the City responded with unambiguous rejection.[82] The trial court properly determined there was no genuine issue of material fact; the overall course of dealing does not reflect a mutual intent that the City would supply water to GPDC.

At oral argument, GPDC also advanced a policy argument, suggesting developers should be able to rely on municipalities for water and should not be required

---

[81] Clerk's Papers at 343.

[82] The post-1972 rejections by the City are also consistent with the 1976 decision in Brookens that a city has the discretion to adopt an ordinance to supply water only when the user complies with the general land use plans. Brookens, 15 Wn. App. at 467.

to race to develop their property once they receive any assurance of the availability of water. The implied contract through course of dealing—the doctrine expressed in Harberd and Brookens—recognizes this policy concern, but requires a genuine mutual understanding, as in any other contract. The facts here do not satisfy the legal standard of mutuality.

### c. Statute of Limitations

In addition to granting summary judgment to the City on the substance of GPDC's implied contract claims, the trial court also granted summary judgment based on the statute of limitations. The trial court correctly determined that even if an implied contract existed, GPDC did not timely sue for breach of that implied contract.

The City contends the three-year statute of limitations[83] for actions arising from unwritten contracts applies.[84] GPDC agrees the three-year statute of limitations applies to the City's conduct after 1972, but contends the six-year statute of limitations under RCW 4.16.040 applies to the City's express obligation in 1972 to provide water to the 308-lot subdivision. We apply the three-year statute of limitations in RCW 4.16.080(3), as GPDC did not plead a cause of action for breach of an express contract.[85]

---

[83] RCW 4.16.080(3).

[84] Whether the statute of limitations bars a plaintiff's claim is a legal question reviewed de novo. Washburn v. Beatt Equip. Co., 120 Wn.2d 246, 263, 840 P.2d 860 (1992). Division Three of this court rejected the argument that no statute of limitations exists on the issue of whether the City is a public utility. Harberd, 120 Wn. App. at 513. Rather, the court applied the three-year statute of limitations for actions arising from unwritten contracts, RCW 4.16.080(3), because Harberd's objective in arguing the City was a public utility was to support his breach of contract claim. Id.

[85] Even under a six-year statute of limitations, GPDC provides no persuasive argument that its 2009 lawsuit was timely.

In its briefing and at oral argument, GPDC articulated that the purported implied contract involved a broad obligation to provide water and approve designs. Such a theory necessarily includes the City's duty to approve GPDC's development plans and to confirm the availability of water, whenever GPDC submitted those plans for approval. Under this implied contract theory, the question remains when the City breached the alleged implied contract.

The City contends any implied contract ceased to exist between 1973 and 1974, when GPDC failed to obtain final plat approval, abandoning the 308-lot development. The City alternatively argues the latest possible breach of the implied contract occurred in 1990, when the City told the County it would not provide water, preventing GPDC from obtaining short plat approval from the County. GPDC responds that the City's decision in 1990 did not start the running of the statute of limitations because only the City's 2009 denial of GPDC's request for contract services constituted repudiation of the implied contract. GPDC ignores that it requested City water long before 2009, specifically in 1990 and in 1992.[86]

---

[86] GPDC relies on federal case law for the proposition that the City's various refusals to provide water over the last 30 to 40 years did not trigger the limitation period, because GPDC had the option of either waiting until the City's time to perform had arrived in spite of the repudiation, or acting upon the repudiation immediately (at which point, the statute of limitations would begin to run). See Appellant's Reply Br. at 11-13 (citing Franconia Assocs. v. United States, 536 U.S. 129, 122 S. Ct. 1993, 153 L. Ed. 2d 132 (2002) (repudiation gives the promisee the right of electing either to wait until the time for the promisor's performance has arrived or to act upon the renunciation and treat it as a final assertion by the promisor that he is no longer bound by the contract). GPDC contends the first time it "formally" requested water from the City, triggering the City's duty to perform, was on February 11, 2009, when it submitted the request to the public works director that the City formalize a contract for water services.

Under Washington law, anticipatory repudiation is "an express or implied assertion of intent not to perform a party's obligations under the contract *prior* to the

28

Construing the implied contract in favor of GPDC—assuming the City was obligated to provide water to *any* development of GPDC's property whenever GPDC requested it—the City's performance became due in 1990, when GPDC submitted its short plat to the County, indicating the City would provide water.[87] In response, the City replied, "Water is <u>NOT</u> available to new lots in this area from the City of Bellingham. The property is outside our Water Service Zone and outside the Urban Service Area jointly set by the City and County."[88] At that point, the statute of limitations began to run on the City's breach.

GPDC contends the 1990 denial needs to be understood in the context of a conversation between Jepson (GPDC's engineer) and Garner (public works director). Jepson testified that in 1990, when he talked to Garner about the short plat, Garner told Jepson that the City did not want piecemeal development of the property. If GPDC wanted water for the short plat and only the short plat, the City would have assented.

time for performance." Wallace v. Kuehner, 111 Wn. App. 809, 816, 46 P.3d 823 (2002) (emphasis added). An anticipatory repudiation occurs via a "positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations." Lovric v. Dunatov, 18 Wn. App. 274, 282, 567 P.2d 678 (1977). Repudiation following partial breach by nonperformance is to be treated as a total breach and not as an anticipatory breach, meaning the promisee cannot await continuing performance and toll the statute of limitations. See Colwell v. Eising, 118 Wn.2d 861, 868-69, 869 n.4, 827 P.2d 1005 (1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 253 Reporter's Note (1981)). GPDC's anticipatory breach argument fails because GPDC's alleged implied contract theory necessarily imposes a broad duty on the City. Under this theory, the City had the duty to perform by confirming water was available in response to the 1990 and 1992 requests. The City unequivocally declined to confirm water was available when GPDC requested it in 1990 and 1992. GPDC did not have the option to wait 27 to 29 years to file its lawsuit for breach of the implied contract.

[87] GPDC does not appear to reconcile the 1992 denial with Garner's 1990 statement that GPDC should pursue comprehensive development.

[88] Clerk's Papers at 1167, 1234.

29

According to Jepson, Garner explained that if GPDC wanted more water for larger development, GPDC should request it all at once. This led to GPDC's application for the 141-lot subdivision. However, when GPDC requested water for the 141-lot plat in 1992, the City declined to provide water. Accordingly, at the latest, the three-year statute of limitation began to run in 1992, when the City denied water for the current 141-lot development. The conversation with Jepson does not alter the critical fact that the City unequivocally rejected any right to City water in 1990.

We affirm the trial court's grant of the City's first motion for partial summary judgment.

## SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT
### RCW 43.20.260 & FEASIBILITY STUDY

In its second motion for partial summary judgment, the City argued it had not violated RCW 43.20.260 or WAC 246-290-106 when it refused to provide water to GPDC. The City also argued that it was not required to undertake a feasibility study of GPDC's proposed water plan under BMC 15.36.090 (2008) because another ordinance prohibited the City from providing water outside the urban growth area, regardless of feasibility.

a. RCW 43.20.260

RCW 43.20.260 sets forth the circumstances under which a municipal water supplier has a duty to provide water service. The statute provides:

> A municipal water supplier, as defined in RCW 90.03.015, has a duty to provide retail water service within its retail service area if: (1) Its service can be available in a timely and reasonable manner; (2) the municipal water supplier has sufficient water rights to provide the service; (3) the municipal water supplier has sufficient capacity to serve the water in a safe and reliable manner as determined by the department of health; and

(4) it is consistent with the requirements of any comprehensive plans or development regulations adopted under chapter 36.70A RCW or any other applicable comprehensive plan, land use plan, or development regulation adopted by a city, town, or county for the service area and, for water service by the water utility of a city or town, with the utility service extension ordinances of the city or town.

The City argued the following circumstances absolved it of its duty to provide water: (1) Governors Point is not in the City's retail service area; (2) GPDC had applied for a bulk water contract, and the applicable laws pertained only to retail water service provided directly to consumers; (3) provision of water to GPDC would not be consistent with the City's plans, regulations and ordinances, including its utilities service extension ordinance.[89]

The trial court correctly determined the City did not have a duty under the statute because the City's utilities service extension ordinance, Ordinance 2006-03-026, prevented extension or expansion of water service outside the urban growth area.[90]

---

[89] Under RCW 43.20.260, the City was under a duty to provide water only if all the statutory conditions existed. The trial court did not rule on the first two arguments but granted summary judgment on the third, finding the City had no duty to provide water because doing so would conflict with the City's utilities service extension ordinance, which prohibits provision of water outside the urban growth area. The trial court's refusal to rule on the City's alternative grounds for summary judgment is the purported basis for the City's cross appeal. RAP 3.1 provides that "[o]nly an aggrieved party may seek review by the appellate court." The City is not an aggrieved party. "An aggrieved party is one whose proprietary, pecuniary, or personal rights are substantially affected." Cooper v. City of Tacoma, 47 Wn. App. 315, 316, 734 P.2d 541 (1987). The resolution of the City's second motion for partial summary judgment fully and finally resolved all of GPDC's claims against the City. The trial court was under no obligation to rule on the absence or existence of all the conditions. City of Tacoma v. Taxpayers of City of Tacoma, 108 Wn.2d 679, 685, 743 P.2d 793 (1987) (a party that merely objects to the reasoning underlying a trial court order is not aggrieved under RAP 3.1).

[90] Ordinance 2006-03-026 provided, "The City will not extend or expand urban governmental services such as water and sewer outside the [urban growth area] unless authorized by law." Clerk's Papers at 1124. The ordinance also provided that while the City would not terminate any water service in existence that was outside the urban

GPDC argues that because its proposal for water service was consistent with the County's comprehensive plan and zoning code, the City's comprehensive plan should not matter. GPDC's argument ignores the plain language of the statute. The duty to provide water attaches if service would be consistent with city regulations, including utilities service extension ordinances.[91]

Further, Governors Point is not in the "retail service area" as defined by WAC 246-290-010(215):

> "Retail service area" means the specific area defined by the municipal water supplier where the municipal water supplier has a duty to provide service to all new service connections. This area must include the municipal water supplier's existing service area and may also include areas where future water service is planned if the requirements of RCW 43.20.260 are met.

"Retail service area" contemplates the area where the City is obligated to provide direct connection to "all new service connections," i.e., where the City cannot refuse to provide water service. GPDC requested service under BMC 15.36.090, which governs "Requests for Contract Services or Enlargement of Service Zones."[92] GPDC's application for water service in 2009 specifically requested a "Formal Water Resale Contract."[93] In the application, GPDC requested that the City recognize GPDC as a retailer of City water, and suggested it had historically operated as a retailer, rather than

---

growth area, "City Council does not intend for the continuation of these existing services to be modified, expanded or extended." Clerk's Papers at 1124.

[91] GPDC's other argument is that the City agreed to extend service to all of Governors Point because the City had already extended service there many years ago. This argument lacks merit because Ordinance 2006-03-026 unequivocally addresses the City's unwillingness to extend or expand beyond its current service.

[92] Clerk's Papers at 116.

[93] Clerk's Papers at 718.

receiving direct service.[94] GPDC did not request direct service connections. GPDC's own characterization of the water service it sought is inconsistent with the definition of "retail service area." We affirm the trial court's decision on this alternative ground as well.

### b. Feasibility Study

Finally, GPDC contends the trial court erred in determining that the City did not have a duty to conduct a feasibility study of its 2009 request for contract water service. GPDC sought declaratory judgment on this issue, as well as a writ of mandamus.

Once an entity requested "contract" service under Ordinances Nos. 2006-03-026 and 2006-06-064, the City code in effect at the time described a specific process by which the City determined whether to extend service.[95] The process included consideration by the director of public works about service and/or system-related matters, and required the public works department to prepare a feasibility report with recommendations addressing the service issues.[96]

The City responds that it should not be required under one ordinance to conduct a feasibility study of GPDC's request for contract service, where Ordinance 2006-03-

---

[94] GPDC sought "a formalized contract with the City to allow GPDC to continue in its function as a water association to purchase water from the City and resell that water to the entire planned development at Governors Pointe" Clerk's Papers at 726. The request further stated, "We are simply seeking to formalize an implied contract with the City that would allow [GPDC] to continue to function as a bulk water purchaser and reseller to the Governors Pointe Development." Clerk's Papers at 719.

[95] BMC 15.36.090 (2008). Ordinance No. 2011-05-025, passed on June 2, 2011, changed the process, allowing the public works director to summarily deny a request for contract services.

[96] The feasibility report was to be completed within 30 days of the City's receipt of the request for contract service.

026 prohibits it from providing contract service. The City's argument is persuasive. "Mandamus is inappropriate to command 'the performance of useless or vain acts.'"[97] Because the City had no duty, under either RCW 43.20.260 or an implied contract theory, to provide GPDC with City water, ordering the City to conduct a feasibility study would have been a useless act.

We affirm the trial court's grant of the City's second motion for partial summary judgment, and we affirm dismissal of GPDC's claims.

WE CONCUR:

---

[97] Eugster v. City of Spokane, 118 Wn. App. 383, 422, 76 P.3d 741 (2003) (quoting Vashon Island Comm. for Self-Gov't v. Wash. State Boundary Review Bd., 127 Wn.2d 759, 765, 903 P.2d 953 (1995)). A court "'will not compel by mandamus the doing of an act that would serve no useful purpose, nor should a writ issue when by operation of law a compliance with the mandate could have no operative effect.'" Id. (quoting State ex rel. City of Tacoma v. Rogers, 32 Wn.2d 729, 733, 203 P.2d 325 (1949)).